[Civ. No. 12860.   Second Dist., Div. Three.   Mar. 17, 1942.]

J. H. OVERLAND, Respondent, v. JOHN A. DAVIS, Appellant.

508

Bailey & Poe for Appellant.

Roger R. Walch for Respondent.

SHINN, J.—Defendant Davis has appealed from a judgment against him and his defaulting codefendant Palumbo in the sum of $2,374.48. One count of the complaint was for the reasonable value of cattle sold to the defendants in that amount; the second count was based upon a check of defendant Davis in favor of plaintiff for the sum of $1,000 given in connection with transactions, and included in the sum, involved in the first cause of action, and upon which payment had been stopped. Findings were in favor of plaintiff on both causes of action.

A reversal of the judgment is called for because of the insufficiency of the evidence and for error in the admission of evidence.

The proper disposition of the appeal has required a somewhat tedious study of the evidence relating to matters of accounting between two livestock brokers and a cattle dealer with whom they had a multitude of business transactions within a brief period of time. While the amount involved is not large, the evidence was presented in a confusing manner. The labors of the trial judge would have been considerably lessened had counsel in the case provided the services of a skilled accountant for the assistance of the court. Judges should not be expected to do the work of accountants.

We shall discuss the facts as they are established by uncontradicted evidence. There is in reality no conflict as to the controlling facts.

Plaintiff Overland was a licensed livestock broker and auctioneer with a sales yard at Hanford. Davis was engaged in the same business at Hynes, California. Defendant Palumbo was a licensed dealer in livestock. These are distinct avocations, separately licensed by the State. (Agricultural Code, secs. 368, 1263, Deering's Codes of California (1937), pp. 80, 284.) During the months of August to November, inclusive,

1937, Palumbo purchased livestock from Overland, in the latter's auction ring at Hanford, and shipped them to Davis to be sold by the latter in his auction yard at Hynes. Palumbo made all of the purchases from Overland, his account with Overland was in his own name, and the cattle sold were not charged to Davis. The latter could be held responsible for the account only upon the theory that Palumbo purchased the cattle for Davis, or for himself and Davis jointly as the agent of the latter, or upon the theory that he acted and Overland dealt with him as the ostensible agent of Davis. None of these theories of liability is sound.

Palumbo had been a cattle dealer for some twenty-five years; he had transacted business with Overland in the latter's capacity of livestock auctioneer for some six years. He expressed to Overland a desire to ship cattle to the Los Angeles market, which the latter advised him not to do. However, about the first of August, 1937, Palumbo visited Davis at Hynes and made an arrangement to ship cattle from Hanford to Hynes for sale at auction by Davis, who agreed to and did advance some $2,300 to Palumbo which the latter was to use for the purchase of cows. Palumbo deposited $400 with Davis for the shipment of one carload of cattle consisting of about twenty-five head, which deposit was to serve as a guarantee to Davis against loss on the shipment. Under the arrangement then made Davis was to receive cattle in his yard as they were shipped by Palumbo, to care for them until they were sold, and to sell them upon the customary terms for the sale of livestock at auction. Davis' advances were in the form of drafts upon himself which were furnished in blank to Palumbo, to be filled in and delivered to the sellers of the cows as purchases were made. The form of draft used was accompanied by a bill of sale and warranty of title by which Palumbo conveyed to Davis title to the cows as they were purchased. These transfers of title were purely by way of security. Palumbo shipped the first carload and from time to time made other shipments. On Davis' books Palumbo's account was charged with advances, with the expenses connected with the handling of the cattle, with Davis' commissions as auctioneer, and was credited with the amounts received for cattle sold. Davis had no interest in any profits which might result from Palumbo's operations; his sole remuneration was that which came to him as a livestock broker, including minor charges for work of a clerical nature. During

all of the period in question the business of the two men continued on this basis. Palumbo drew comparatively small sums of money against expected profits, which were charged to his account by Davis, he received statements of auction sales as often as they were held—there were twelve in all,—he always had on hand at Davis' yard a number of cattle which had not been sold, and no balance of the account was ever struck until on or about the 26th day of November, 1937, when all cattle which had been shipped in Palumbo's name had been sold. The periodical statements took into consideration the cows that were on hand, apparently at their cost prices. After all cattle on hand in November had been sold, Palumbo remained in debt to Davis in the sum of $132.46.

The business between Overland and Palumbo was carried on as follows: Palumbo purchased cows at auction in Overland's sales yard and these sales were charged to his account. He also bought cows from farmers and brought them to Overland's yard. When a sufficient number had been accumulated a shipment was made by Palumbo to the Davis yard at Hynes. In the beginning Palumbo drew drafts on Davis in payment for cattle, and not infrequently when the sellers would not accept the Davis drafts Overland would issue his own checks in payment for cattle purchased by Palumbo and would accept in exchange drafts drawn on Davis. Palumbo received cash advances from Overland which were charged to his account. He also had a great variety of dealings with Overland which were entirely foreign to his business with Davis. During the time in question an open account with Palumbo was carried by Overland. Although from time to time, as shipments were made, Palumbo would issue drafts on Davis in favor of Overland which would be credited to Palumbo's account and would be paid by Davis, the business was not done on a cash basis. Palumbo purchased more cattle than he paid for and more than he shipped to Davis, he had a variety of other dealings with Overland, and when the account was closed in December, 1937, it showed a balance due Overland of $2,374.48. Overland had no interest in Palumbo's business. He operated as Davis did, solely as a livestock broker and auctioneer.

It appears without doubt that each of the three men involved conducted his own business in which he alone was interested. There was no partnership arrangement or sharing of profits between Palumbo and Overland or Palumbo and

Davis. Neither of the brokers guaranteed to the other payment of Palumbo's account and neither had any interest in cattle purchased by Palumbo except insofar as possession and control of the cattle from time to time afforded security for moneys that had been advanced to Palumbo. Prior to the institution of this suit neither broker at any time called on the other to make good Palumbo's indebtedness.

There is nothing in this evidence to show that Davis either by himself or jointly with Palumbo was a purchaser of cattle from Overland. He made no purchases directly nor did Palumbo ever have authority to purchase for him. All of the latter's purchases were made for his own account. The manner in which Davis conducted his business with Palumbo demonstrates that he was acting merely as a broker. In every statement rendered to Palumbo he charged the latter with all of the expenses of handling and selling the cattle and credited him with all of the receipts from sales. There was therefore no evidence to support a finding that Overland sold any cows to Davis or that the latter ever agreed to pay for any that were sold to Palumbo.

It is contended by respondent that Palumbo acted as the ostensible agent of Davis and that Overland so regarded and dealt with him. There is nothing in the record to support this contention. Overland in his testimony repeatedly and consistently stated that his sales were made to Palumbo and, as we have seen, they were all charged to the latter. Palumbo did not represent to Overland that he was purchasing for Davis' account nor did Overland testify that he understood that Davis was interested in any of the transactions as a buyer. It is clear from Overland's testimony of conversations had with Davis that he understood that the latter was financing purchases by Palumbo as an incident to his brokerage business, and that he was not purchasing cattle himself or jointly with Palumbo. In fact Davis financed other dealers who also purchased cattle from Overland as a broker, and Overland in the same manner financed Palumbo and other dealers in the purchases of cattle, although upon a smaller scale, but they did not buy and sell upon their own accounts. Overland testified to a conversation he had with Davis about September 1, 1937, at which time none of the transactions here involved had taken place, as follows: "He (Davis) went on to tell me that he had made arrangements with Mr. Palumbo for him to buy cattle up to a truckload, and he had

gone in and bought $3,000 worth of cattle and he was not financing any man for that much money. . . . and I did tell him at the time that he had better hold Mr. Palumbo down a little bit, because he was a great hand for shooting in a big way and lots of times it was dynamite. . . . Q. He told you at that time that his arrangement with Palumbo was to finance him just for a load of cattle at a time? A. Yes, sir. Q. He said that this was more than Palumbo should have purchased, but he made it good just the same, did he? A. Yes, sir. Q. Following that discussion did Mr. Palumbo continue to buy cattle from you to ship to the Davis Sales Yard? A. Yes, sir. Q. And did Mr. Davis continue to pay for the cattle? A. Yes, sir.''

In October, 1937, Palumbo purchased sixteen head of cows from Overland, which he represented to Davis to be ''queens'' or ''top cows.'' Davis issued his check to Palumbo and Overland in the sum of $1,000 as part payment for the cows, having arranged with Palumbo to advance that amount. The cows were shipped to Davis by Overland and Davis stopped payment on the check. Overland went to see Davis and the latter stated as a reason for his having stopped payment that the cows were inferior. Overland questioned Davis at that time about the condition of Palumbo's account, asking, ''Well, how much is it in the red?'' and Davis replied, ''Well, four or five or six cows will straighten it up.'' Overland said, ''If that is the case, go ahead and sell them and we can work it out. Q. Go ahead and sell them and credit it onto the account? A. Yes.'' This Davis did, although some of the cows had to be fed for a long time, before they were fit to sell. Overland at the same time requested Davis to send him any balance remaining after Palumbo's account was paid, stated that any shipments in the future would be made in his own name and requested that remittances should be made to him. He examined Palumbo's account on Davis' books at that time. Overland's name was substituted for that of Palumbo on Davis' books, but it does not appear that Overland was advised of that fact. It has no significance in the case, however. The business continued, but under somewhat different conditions. Overland as a broker continued to sell cattle to Palumbo on open account and to ship them, not as an owner but as a broker, to Davis but Davis was not called upon to finance the purchases. He received and sold them and made remittances to Overland. Palumbo mean-

while purchased cows elsewhere with drafts on Davis which were paid and the cows were sold through the same account as the ones coming from Overland. Although the account was not closed out until the end of January, 1938, when all cattle had been sold, it was transferred to Overland's name as of November 1st and Palumbo's account was balanced as of November 26th, showing a balance in Davis' favor of $132.46 but the business went on, notwithstanding. Overland's account with Palumbo showed items as late as December 20, 1937. Upon a final closing of Davis' books a balance was due him in the amount of $124.53. Undoubtedly Overland arranged that all moneys payable by Davis should come to him as a measure of security when he learned that Palumbo's account with Davis showed a balance in the latter's favor. But he had no account with Davis on his books, continued to make sales to Palumbo without transferring title to him, and continued to sell through Davis. There was nothing in this course of business even suggesting the sale of cows to Davis. All of the evidence upon the subject tends to show that Overland knew exactly what the business arrangement and relationship were between Davis and Palumbo.

As to the second cause of action the evidence sustains the findings as to the issuance of the check for $1,000 and that payment was stopped thereon, but the finding that the sum of $1,000 represented by the check has not been paid is not sustained by the evidence.

The evidence shows without dispute that Davis and Palumbo were dealing solely in dairy cows and bulls. Calves which accompanied the cows or were born of cows in Davis' possession were necessarily involved in the account. Records of the account between Davis and Palumbo and between Davis and Overland, as heretofore explained, were introduced in evidence, together with a detailed record of all cattle received by Davis and the proceeds received from sales. The accuracy of these books was not and is not questioned. It appears therefrom that Davis not only paid for everything he received from the beginning to the end of his dealings with Palumbo and Overland, but also that there remained unpaid to him on the two accounts the total sum of $256.99.

The account books of Overland showing the account of Palumbo, and which showed a balance of $2,374.48 in favor of the former, were introduced in evidence in support of the claim of Overland, over the objections of Davis. These

objections should have been sustained for various reasons. The account books were not admissible against Davis in the absence of a showing of a joint liability of Palumbo and Davis for the items in the account. There was no proof of such joint liability. Other reasons are that the account did not purport to be one embracing transactions between Overland and Davis and it did not purport to be confined to transactions with Palumbo in which Davis was interested. Palumbo's business with Davis, as we have seen, consisted of shipping dairy cattle to the latter for sale, and nothing else. However, at the same time his business with Overland covered a much wider field. The account of transactions on which Davis was sued embraced also all of the business dealings between Palumbo and Overland. There were many transactions shown in the account with which Davis had nothing whatever to do. A few examples will suffice to demonstrate this fact. Palumbo purchased ''Whiteface'' steer beef, paying therefor $1,347.22, which Overland advanced to him. This amount was charged to Palumbo in the Overland account. They were sold for $957.88, or at a loss of $389.34, and this loss is included in the account in question. Also included in the account are charges and credits showing dealings in horses, mules, one colt, heifers, calves, pigs, an animal referred to by counsel as a ''bull cow,'' hay, feed, promissory notes, cash advanced, unexplained checks and advances, and telephone calls. The promissory notes were for $1,254.23 and $300, respectively. Palumbo was questioned about them but was unable to offer any explanation as to what the notes represented. In fact no explanation at all was given of these items or of many others which went into the account upon which the judgment was based. The account was admitted against Davis upon the assurance of respondent's counsel that no recovery was sought against Davis for items in the account which did not relate to transactions in which he was engaged. It does not require a meticulous examination of the account to see that $1,943.57 of the amount claimed could not be chargeable to Davis or recovered in this action upon any theory because the three items mentioned did not concern Davis, nor involve purchases of cows. The further the account is examined the more questionable it appears whether cows purchased with Davis' money were not reported to Davis as having cost considerably more than Palumbo had paid for them.

There was only a smattering of evidence in the record which attempted to segregate the items in the account representing shipments to Davis and those which could not under any tenable theory be charged against him. It appears that Palumbo's total operations with Overland, assuming that he was credited with all sums received by Overland from Davis, showed a net loss in operations of $2,374.48. But it likewise appears, and much more satisfactorily, that Davis paid in full for all cattle received by him from the beginning to the end of his dealings with both Palumbo and Overland. The amount represented by the check has therefore been paid.

The loss which Overland has sustained is traceable to only two sources, first to expenses incidental to the handling of the cattle by Davis, including feeding, branding, testing, hauling, losses by death, commissions on auction sales, etc., all of which charges naturally reduced the cash amounts remitted by Davis from the proceeds of auction sales, and secondly, to Palumbo's independent operations and business transactions with Overland, which were entirely separate and apart from the business in which Davis was interested. Davis was not shown to be responsible or liable for those losses.

Davis had a counterclaim against Overland for $124.53, the balance of his account at the end of the business between the two. No finding was made with reference to this counterclaim although the effect of the judgment was to disallow it.

The judgment is reversed.

Schauer, P. J., and Wood (Parker), J., concurred.